FILED
2013 Sep-30  AM 10:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CHRISTOPHER BUTCH GUTHRIE,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **CIVIL ACTION NO.** |
| | )   **2:11-CV-3081-KOB** |
| | ) |
| **MICHAEL J. ASTRUE** | ) |
| Commissioner of Social | ) |
| Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 30, 2009, the claimant Christopher Butch Guthrie filed Title II and Title XIV

applications for Social Security Disability Insurance ("SSDI") and Supplemental Security Income

("SSI"), respectively. The claimant alleged a disability onset date of May 31, 2004 under both

applications (R. 53-54). The claimant alleged disabling impairments of back and neck injury,

agoraphobia, and panic attacks. (R. 60-61). The Commissioner initially denied the claim on

August 10, 2009.  (R. 55).  The claimant timely filed a request for a hearing before an

Administrative Law Judge (R. 62-63), and the ALJ held a hearing on December 22, 2010. (R.

68).  At the hearing, the claimant amended the alleged onset date to March 30, 2009, resulting in

the dismissal of his Title II application based upon his date last insured. (R. 30).  In an opinion

dated March 4, 2011, the Commissioner found that the claimant was not disabled under sections

216(1), 223(d), and 1614(a)(3)(A) of the Social Security Act, and therefore, was ineligible for

supplemental security income.  (R. 8).  The Appeals Council subsequently denied the claimant's request for review on June 23, 2011, and the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.  (R. 1).  As the claimant has exhausted his administrative remedies, this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUE PRESENTED

The issue before the court is whether the ALJ failed to adequately develop the record by failing to re-contact Dr. Blotcky or to order an additional consultative examination from a qualified psychiatrist or psychologist after finding inconsistencies in Dr. Blotcky's medical opinion regarding the claimant's  limitations under the "paragraph B" criteria for mental impairments.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence.

2

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the claimant presently unemployed?
> (2) Is the claimant's impairment severe?
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the claimant unable to perform his or her former occupation?
> (5) Is the claimant unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

3

The ALJ commits reversible error if he exercises his discretion not only to make a determination of disability but also to disregard medical evidence in favor of his own impressions. "An ALJ...abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians." *Marybury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring).

While the burden rests with the claimant to prove a disability, the ALJ has a duty to develop a full and fair record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. § 416.912(c). When the evidence shows that the claimant has a mental impairment, the ALJ may determine that the claimant is not disabled "'only if the [ALJ] has made every reasonable effort' to obtain the opinion of a 'qualified psychiatrist or psychologist.'" *McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988) (quoting 42 U.S.C.A. § 421(h)); *see also* 20 C.F.R. § 416.903(e).

To further fulfill his duty to develop the record, an ALJ should re-contact a doctor if the doctor is a treating source, the treating source's opinion is unclear on an issue reserved for the commissioner, and the ALJ is not able to ascertain the basis for the opinion from the record. SSR 96-5p. If the ALJ cannot make a determination based on the record, he has a duty to re-contact a doctor. *See Johnson v. Barnhart*, 138 Fed. Appx. 186, 189 (11th Cir. 2005) ("Medical sources should be re-contacted when the evidence received from the source is inadequate to determine if the claimant is disabled."); *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need re-contact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.").

His duty to fully develop the record "requires the ALJ to order a consultative evaluation

4

when such an evaluation is necessary to make an informed decision." *Smith v. Commissioner*, 501 Fed. Appx. 875, 878 (11th Cir. 2012). The ALJ's duty to order a consultative examination can be triggered when an inconsistency in the evidence exists or the medical record as a whole does not support a determination on the disability claim. 20 C.F.R. § 416.903(a); 20 C.F.R. § 416.919. However, the ALJ does not err in denying a request for a consultative examination if substantial evidence otherwise supports the ALJ's decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209-10 (11th Cir. 1988); *see also Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984).

An assessment of a GAF score between 30-50 can indicate serious mental impairments in functioning. *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. 2006) (citing the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994). For any GAF score in the medical record revealing possible serious mental impairments, the ALJ should determine what weight, if any, to give that particular score. *Id*. However, the GAF scale "'does not have a direct correlation to the severity requirements in [the] mental disorders listings.'" *Nye v. Commissioner of Social Sec.*, 2013 WL 3869964 (11th Cir. July 26, 2013). Therefore, the ALJ is not required to rely on a GAF score in making his ultimate disability determination. *Luterman v. Commissioner*, 518 Fed. Appx. 683, 690 (11th Cir. 2013).

## V. FACTS

The claimant was 37 years old at the time of the hearing and had earned a high school diploma. (R. 19). His past work experience includes working as a forklift operator, router operator, and a lathe operator. (R. 49). The claimant initially requested disability based upon back and neck injuries, agoraphobia, and panic attacks. (R. 60).

*Mental Limitations*

Over the course of the claimant's incarceration at Limestone Correctional Facility from December 21, 2001 to August 11, 2006, the claimant sought treatment for several mental impairments.  (R. 222-395).  On February 6, 2002, the prison system documented that the claimant suffered from panic disorder with agoraphobia and polysubstance dependence.  On that date, the claimant completed a medical history and screening form stating that he had been hospitalized for anxiety in the past. The claimant also admitted to daily opiate drug use, stating that its last occurrence had been one-and-a-half years ago. (R. 234).

On February 6, 2002, a psychiatrist with the Alabama Department of Corrections Mental Health Services conducted a psychiatric evaluation of the claimant.[1]  The psychiatrist found that the claimant had no suicidal ideation and posed no risk of violence; that the claimant had a normal mental status aside from his "worries" and general anxiety. Nonetheless, the psychiatrist diagnosed the claimant with polysubstance dependence, panic episodes with agoraphobia, and personality disorder. The psychiatrist found the claimant to have a Global Assessment of Functioning (GAF) of 70. The psychiatrist's treatment recommendations included taking Paxil and Vistaril; referral for counseling; referral to a substance abuse professional; and a follow-up visit in two weeks. (R. 259-260).

On February 13, 2002, the claimant completed the Minnesota Multiphasic Personality Inventory (MMPI-2) offered through the Kilby Correctional Facility. However, the claimant left blank more than thirty questions. As a result, the interpretative report stated that the profile was

---

[1]  Where the court has not specifically named an individual, the name is either absent from or illegible in the record.

6

very likely invalid. (R. 253).

On February 14, 2002, C. Golding, who holds an M.S., completed a psychological interview and data entry form for the claimant. Although the form is difficult to read because of the quality of the copy, the interviewer clearly identified the claimant as having a serious mental illness that involved anxiety. The interviewer also circled a mental health code indicating a history of serious mental illness. (R. 249).

On March 5, 2002, the claimant underwent a psychiatric examination as part of his admission to a new facility. The examining psychiatrist determined that the claimant had a GAF score of 50; a history of severe substance abuse of narcotics and benzodiazepine; no suicidal ideation or risk of violence; and no history of serious mental illness. The examining psychiatrist noted in additional comments that the claimant did not have a serious mental illness apart from his substance abuse. (R. 244-246).

On May 6, 2003, the claimant submitted a request to meet with a psychiatrist to address his "anxiety/panic attack disorder." He stated that he used to be on medication for this condition. However, the claimant did not deem it an emergency. A note from the nurse who processed the request indicated that the claimant had a neat, well-groomed appearance and was not anxious at the time of the request. (R. 342).

On May 30, 2003, Donna Earnshaw, MD visited the claimant. She noted that the claimant stated he was suffering a lot of depression because of his grandmother dying. The claimant also stated that he had a panic-anxiety disorder. As part of his history, he stated he had received psychiatric treatment but was never hospitalized. In particular, he had received medication such as Klonopin, Paxil, and Zoloft, but had discontinued Zoloft because the antidepressants "flipped

7

[him] out." He stated that he had ceased abusing substance four years previously. The claimant informed Dr. Earnshaw that he did not feel like doing anything, including lifting weights, an activity that he used to engage in previously; that nothing sounds like fun and he has inadequate energy; and that he thought he was bipolar. Dr. Earnshaw stated he showed symptoms of depression. The claimant believed these feelings began with the death of his mother and grandfather while he was incarcerated. Her analysis found an adjustment disorder with depressive mood for which she prescribed trazodone. (R. 243-244).

On June 27, 2003, Dr. Earnshaw followed up with the claimant. The claimant had ceased taking his medications independently because of his concern for their effect on his weight, which Dr. Earnshaw noted had dropped from 158 pounds in 2002 to 134 pounds at the time of the exam. Dr. Earnshaw noted the claimant's desire to deal with the anxiety without medication. At this time, she ceased his prescription for trazodone. (R. 242-243).

On May 11, 2006, the claimant met with Cheryl Cofield, a nurse in the Department of Corrections Mental Health Services Unit. She recorded the claimant as stating "I'm a nervous wreck. I am working in the kitchen and having some panic attacks." She described the claimant as anxious, fearful, but oriented to person, time, and place, with no actual psychosis noted. She stated an intention to refer him to a doctor for medical assessment. (R. 237).

Later that day, a psychiatrist affiliated with the Alabama Department of Corrections completed a psychiatric evaluation form regarding the claimant on referral from the examining nurse. The examining psychiatrist stated that the reason for the claimant's referral was panic and anxiety disorder. The psychiatrist diagnosed the claimant with agoraphobia with panic attacks; assessed the claimant with a GAF score of 55; and indicated that the claimant had no indication of

8

suicidal ideation or risk of violence. As part of the claimant's treatment plan, the psychiatrist prescribed him Tofranil for his depression and recommended the claimant reduce the pressure of his work, recommending he stay off for a while. (R. 235-236).

On May 18, 2006, the claimant met with Amy Mashburn, RN, who recorded the claimant's desire to cease taking his medication. She stated that she would follow-up with the psychiatrist regarding the claimant's request. (R. 237).

On September 19, 2006, after his release from prison, the claimant visited Cooper Green Hospital Emergency Room complaining of back pain.  The claimant's intake form recorded no psychiatric abnormalities. (R. 209, 211).

On October 17, 2006, the claimant visited Dr. Martin Bohnenkamp, an internist, as a new patient, complaining of anxiety that the claimant stated was a life-long problem. The claimant reported that he suffered "real panic attacks" two-three times daily, but denied suffering from depression, phobias, or obsessive-compulsive traits. Dr. Bohnenkamp noted the long history of anxiety with panic, and treatment through Klonopin.  Dr. Bohnenkamp indicated his intent to treat the claimant with Buspirone and to refer him to a psychiatric center for treatment. (R. 215).

On August 16, 2007, the claimant visited Doctors Med Care of East Gadsden complaining of panic anxiety disorder. The intake form recorded him as smelling and acting drunk. The claimant also stated that he was not on current medication, but that he was under much stress and lived in a trailer with no air conditioning.

On February 29, 2008, the claimant sought treatment at Gadsden Regional Medical Center for pain in his right knee. As part of triage, Lori Peek, RN, assessed the claimant's psycho-social functioning and found the claimant's behavior appropriate for his age and situation. Her notes also

stated that the claimant possessed adequate support systems and that he was able to perform all activities of daily living independently. (R. 428).

On April 29, 2008, the claimant visited Gadsden Regional Medical Center complaining of an abscess under his right arm pit. Tonya Elkins, LPN, completed his intake form and described the claimant as displaying inappropriate behavior along with an anxious appearance. She stated he had an inadequate support system. The claimant did not receive pain medication as requested because he did not have a driver present with him. The records indicate that the claimant became upset after being refused medication. He visited the desk approximately eight times seeking medication and attempting to use the phone. (R. 418-419).

On November 14, 2008, the claimant visited Gadsden Regional Medical Center for lower leg pain. As part of the examination for what would turn out to be an MRSA-infected abscess, Dr. Harold Franks indicated that the claimant appeared alert and oriented to person, place and time. Likewise, Debbie Brooks, RN, who examined the claimant prior to Dr. Franks, found that the claimant demonstrated appropriate behavior; interacted normally with care givers or others present; had an adequate support system available; and had the capacity to complete independently the activities of daily living. (R. 404-405, 409).

On March 6, 2009, the claimant visited Crestwood Medical Center for treatment of generalized abdominal pain. Wayne Jones, MD, examined the claimant and noted his medical history included anxiety.  Dr. Jones indicated that the claimant appeared alert and oriented to person, place, and time. Dr. Jones found that the claimant was taking Klonopin, Methadone, Soma, and Lortab. Wanda Shoemaker, RN, took the claimant's history at intake and indicated that the claimant exhibited normal behavior. She also recorded that he had adequate support systems

10

available and retained the capability to perform all the activities of daily living without assistance. (R. 443, 446).

On May 13, 2009, the claimant visited Cherokee-Etowah-DeKalb ("CED") Mental Health Center and met with Linda Cooper, a mental health counselor, indicating that he wanted mental health services rather than substance abuse services. The claimant denied drug abuse. Ms. Womack, a therapist at the center, included in her report that the claimant had a history of depression; that he became easily agitated; that he was treated for agoraphobia; and that he suffered from a panic disorder. The claimant stated he had been treated via a private physician in Huntsville, but could not afford such treatment. The claimant stated at this time that he was not looking for work over the past 30 days. However, he did not mark that he was disabled. At this visit, Ms. Womack assessed that the claimant had a GAF score of 30. (R. 1087-1088).

The claimant returned to CED for a follow-up visit with Ms. Womack on June 16, 2009. According to Ms. Womack's notes, the claimant arrived at this meeting looking dirty and disheveled, exhibited a dysphoric mood with constricted affect, but appeared oriented to person, place, time, and situation. She recorded his current GAF as 30. Her notes indicated that the claimant had difficulty staying focused during her interview with him and was easily distracted. She scheduled his next individual therapy session for July 28, 2009 and a positive mental attitude session for July 21, 2009. (R. 1086).

Ms. Womack identified the claimant's significant treatment issues as mood swings with a prominent depressed mood, panic attacks with periods of agoraphobia, and limited social support. Her diagnosis was a bipolar disorder with a depressive type and a panic disorder with

agoraphobia.[2]  (R. 1086, 1090-1094). Her treatment plan was two-fold: (1) to schedule a positive mental attitude visit to assess the claimant's mental impairments and determine the extent of his need for medication; and (2) schedule an individualized counseling session to monitor the claimant's mental impairments and instruct the claimant in symptom management techniques. (R. 1090-1094).

On July 21, 2009, the claimant attended his follow-up visit at CED Mental Health Center complaining of anxiety, panic, and depression. The examiner diagnosed the claimant as having a generalized anxiety disorder and bipolar disorder. The examiner, presumably a psychiatrist, although no name appears on the form, prescribed Geodon and Citalopram for treatment of the claimant's bipolar and depressive disorders. (R. 1080).

On October 26, 2009, CED Mental Health Center discharged the claimant for having no contact with the center for 90 days. The center listed the claimant's pertinent history as mood swings, depression, and panic attacks and his current diagnosis as bipolar disorder and panic disorders with agoraphobia. The discharge paper also listed the claimant's GAF score of 30 from the time of his admission on May 13, 2009.  (R. 1083).

On December 1, 2009, the claimant visited the University of Alabama at Birmingham Emergency Room seeking treatment for abdominal pain. Elizabeth Phillips, MD, examined the claimant. She found him alert and oriented to the person, place, time, and situation. In her patient history, she highlighted the claimant's list of pain management prescriptions, but stated that the

---

[2] A medical doctor or licensed psychologist, whose signature is illegible, concurred with her diagnosis on June 17, 2009.  (R. 1094).

claimant could not explain why he continues to see a pain management physician.[3] (R. 1097-

1098).

On March 7, 2010, the claimant visited Crestwood Medical Center complaining of

depression. During his intake, the claimant stated to Terrence Go, RN, that he had given suicide

some thought but that he did not have the guts to do it.  During collection of his patient history,

the claimant denied illicit drug use.  Dr. Sofia Aeschlimann, M.D., redirected him to the

psychiatric unit for a twenty-three hour observation after recording her clinical impression of

acute anxiety, acute depression, and chronic back pain. She found him to have a flat affect.

During overnight observation, Antiquel Kennedy, BHRN, recorded that the claimant reported

"extreme depression" and was overly concerned with his pain medication.  She deemed the

claimant extremely unreliable. (R. 1116-1117, 1122, 1164).

Although the primary diagnosis consisted of an unspecified episodic mood disorder, the

claimant also showed signs of an opioid-type dependence. Dr. Aeschlimann described the

claimant's statements of suicidal ideation as a ruse to receive more pain medication. She observed

that the center offered to detoxify him but the claimant refused. Dr. Aeschlimann noted that the

claimant reported that the opiates had been prescribed, but that he appears to have elevated levels

of Soma, methadone, and Demerol. Dr. Aeschlimann recorded her diagnostic impression of the

claimant's mental functioning, including an unspecified mood disorder, opiate dependence, a lack

of psycho social support, and a GAF score of 40. (R. 1128-1129).

On October 28, 2010, the claimant visited Alan D. Blotcky, a clinical psychologist, for a

--------

[3]  Dr. Phillips's report did not indicate the name of the claimant's pain management
specialist.

psychological evaluation at the request of his attorney. Prior to completing the psychological

evaluation, the claimant provided personal, work, social, and medical histories to the doctor. The

claimant related his diagnosis of panic disorder, and bipolar disorder.  The claimant reported to

Dr. Blotcky that he had "major depression and hypomania that last for weeks."  The claimant

related his past history of substance abuse of marijuana and Lortab, but denied taking them at any

point in the last five years.  (R. 1175).

The claimant stated to Dr. Blotcky that he spent his time doing light housework, watching

television, and playing the guitar. The claimant reported having a suspended drivers license for an

unpaid traffic ticket, and that he occasionally visited with a neighbor. He denied having other

close friends.  (R. 1176).

Dr. Blotcky conducted a mental status exam, administered the WAIS-IV psychological

test, and administered the Beck Depression Inventory. The mental status exam revealed the

claimant possessed appropriate grooming; wore appropriate, clean, and neat attire; exhibited

logical and orderly thinking; displayed normal speech; employed adequate abstract thinking; had

accurate memory functioning; appeared depressed; showed restricted affect; and seemed tired and

worn. Dr. Blotcky found the claimant low in energy and prone to uttering morbid verbalizations.

The WAIS-IV indicated the claimant was not mentally retarded, but the claimant received a score

of 40 on the Beck Depression Inventory. Dr. Blotcky stated this score indicated the presence of

severe depression.  (R. 1176).

Dr. Blotcky's diagnostic impression was bipolar disorder, panic disorder without

agoraphobia[4], a history of marijuana and Lortab abuse that was in remission, and a GAF score of 48. Dr. Blotcky opined that the claimant was motivated during the exam and that he believed the test scores were valid. His recommendation was that the claimant be involved in psychiatric treatment on a regular and uninterrupted basis; that the claimant live with a family member or friend; and that the claimant continue treatment for his physical impairments. Dr. Blotcky considered the claimant to have a very poor prognosis. (R. 1177-78).

On November 17, 2010, Dr. Blotcky completed a supplemental questionnaire at the request of the claimant's attorney. Dr. Blotcky indicated on the form the claimant's degree of limitations in the categories espoused in "paragraph B" criteria for assessing mental impairments. The form defined the level or degrees of limitation as

> MILD: Suspected impairment of slight importance which does not affect ability to function
> MODERATE: An impairment which affects but does not preclude ability to function
> MARKED: An impairment that seriously affects ability to function
> EXTREME: Severe impairment of ability to function.

(R. 1179). Dr. Blotcky opined that the claimant suffered from a *marked* limitation in the following categories: restriction of activities of daily living; difficulty maintaining social functioning; ability to respond to customary work pressures; ability to respond appropriately to supervision in a work setting; ability to respond appropriately to co-workers in a work setting; ability to perform repetitive tasks in a work setting. Dr. Blotcky found the claimant suffered from

---

[4] Dr. Blotcky indicated panic disorder "without agoraphobia," and indicates that the claimant has suffered from this impairment since age 20. The medical records indicate that the claimant had previously been diagnosed as having panic disorder "with agoraphobia." The court assumes that Dr. Blotcky mistakenly used "without agoraphobia" instead of "with agoraphobia."

*extreme* limitations in his ability to maintain concentration, persistence, and pace.

Dr. Blotcky considered the claimant to possess *moderate* limitations in the following areas: ability to understand, carry out, and remember instructions in a work setting; ability to perform simple tasks in a work setting. Dr. Blotcky stated that he believed the claimant's impairments would endure for longer than 12 months and that he had performed a psychological evaluation on the claimant. (R. 1179-1180).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for Supplemental Security Income, the claimant received a hearing before an ALJ on December 22, 2010 via video conferencing. (R. 62-63).

The claimant testified that he lives with extended relations including his grandmother, aunt, great aunt, and his uncle's children. (R. 34). The claimant stated that he had graduated high school, had learned to read, write, and do math.  Regarding his past work, the claimant testified that had cut steel at a machine shop using a saw, a lathe, or a milling machine. (R. 35).

The claimant testified that he suffered from several impairments: a panic anxiety disorder; depression; and an inability to stand because of pain in his back. (R. 36).[5]  The claimant stated that he had first experienced panic attacks at the age of 20-21. The claimant blamed his depression on the recurrence of the panic attacks. The claimant testified that the panic attacks were so severe as to make him remain indoors out of fear of facing the world. (R. 38-39).  The claimant testified that his panic attacks occur at least once or twice a week and achieve an intensity that causes the

---

[5]  The claimant's only issue on appeal involves his mental impairments; therefore, this court will only address his testimony regarding his mental impairments.

claimant shortness of breath and leads him to feel like he is going to pass out. The claimant testified that each individual attack only lasts from five-to-seven minutes, but he spends the rest of his time worried that he will experience another one because of their intensity and frequency. The ALJ asked whether he had ever attempted to control the panic attacks through breathing exercises, to which the claimant responded that he had but these efforts had proven ineffective. (R. 40-42).

The claimant stated that although he had begun a treatment regimen at Cherokee-Etowah-DeKalb Mental Health Center, moving to Birmingham ended that relationship and he had not sought treatment at a new center.  The claimant testified that he has received prescriptions for Zoloft and Welbutrin from Dr. Plodka at Phoenix Emergency Care. (R. 39-40).

Regarding his prior drug use, the claimant stated that he had not abused street drugs since 2001 when he went to prison, but that he did continue to take those drugs prescribed to him by his treating physician. (R. 39).   In response to questioning regarding his visit to Crestwood Medical Center where the claimant showed signs of opioid dependence, the claimant attributed this finding to the prescriptions for pain medication that he had for the four years preceding the hearing. The claimant then testified that Crestwood had, in the course of their treatment for his depression, chosen to attempt a detoxification of the claimant rather than continue to fill his prescriptions. (R. 43-44).

The claimant's attorney next addressed the claimant's hospitalization for suicide. The claimant acknowledged that he had suffered from suicidal ideation in the past and continued to experience bouts of it in the present. (R. 44-45).  The claimant testified that transportation to and from therapy presented a problem for him because he has to ride with his aunt and has no personal means of transportation. (R. 45).

17

The claimant further testified that finding transportation to obtain treatment was only one problem. On many days, the claimant did not even have the desire to leave his residence, in part because he considered himself more likely to succumb to a panic attack when he is outside the house. (R. 46).

Mr. William Ellis, a vocational expert, testified regarding the claimant's past work. Mr. Ellis classified the claimant's past work as a forklift operator as very heavy performed, medium DOT, and an SVP of 4; past work as a router operator as very heavy performed, medium DOT, SVP of 4; and past work as a lathe tender as very heavy performed, medium DOT, SVP of 2. The vocational expert did not find that the claimant had any transferable skills and that the jobs listed deviate at the exertional level. (R. 48-49).

The ALJ's first hypothetical posed the following limitations: no exertional limitations; simple, repetitive, non-detailed tasks; casual and frequent co-worker and public contact; direct and non-confrontational supervision; and infrequent and gradual workplace changes.  The vocational expert found that significant work meeting these limitations existed in the national economy, including the claimant's prior role as a lathe tender.  Mr. Ellis testified that other potential positions at a heavy exertional level meeting these limitations included farm worker, janitor, and vehicle cleaner. Mr. Ellis also testified that, at the medium exertional level, several jobs exist meeting these limitations, including material handler, hand packer, and packaging and filling machine operator.  The vocational expert clarified that this list of positions was merely representative rather than exhaustive. (R. 49-50).

The ALJ's second hypothetical involved mental limitations such as the claimant described, with light exertional activity and frequent postural activities.  The vocational expert responded that

such an individual could find work as a hand packer, inspector tester, and machine feeder, and that

such jobs existed in significant numbers in the national economy.  However, in response to the

ALJ's question, the vocational expert testified that if the claimant's mental limitations prevented

him from working 40 hours a week or 8 hours a day, the claimant could not do these jobs.  (R. 49-

50).

*The ALJ's Decision*

On March 4, 2011, the ALJ issued a decision finding that the claimant was not disabled

under the Social Security Act. (R. 8).  The ALJ found that the claimant met the insured status

requirements of the Social Security Act through March 31, 2006.  The ALJ next found that the

claimant had not engaged in substantial gainful activity since March 30, 2009, the amended alleged

onset date of the claimant's disability.  (R. 13).

The ALJ indicated that the claimant suffered from the following severe impairments:

physical impairments of cervicalgia, lumbago, and mental impairments of panic disorder, bipolar

disorder, depressive disorder, and polysubstance abuse. (R. 13-14).

The ALJ discussed in detail the claimant's physical impairments, including cervicalgio and

lumbago.  (R. 14).  However, because the claimant did not raise the ALJ's findings regarding his

physical impairment on appeal, the court will focus on the ALJ's findings regarding his mental

impairments.

The ALJ supported his findings regarding the claimant's mental impairments through

reference to eight years of medical history between February 2002 and March 2010. Those records

documented diagnoses of panic and depressive disorders, intermittent treatment through

prescription medications like Klonopin, Trazodone, Vistaril, and Xanax, and a diagnosis by

Cherokee Etowah Dekalb Mental Health Center of bipolar disorder treated through Geodon and Citalopram.  Regarding the polysubstance abuse, the ALJ noted the repeated diagnoses of opiate and benzodiazepine abuse alongside the claimant's observed intoxication in August 2007 and ultrasound evidence in March 2009 showing enlargement of the liver consistent with alcohol consumption in excess of moderation. (R. 14).

The ALJ determined that the claimant did not possess an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ specifically found that the claimant's mental impairments, considered singly or in combination, do not meet a listed impairment.  The ALJ made this finding after reviewing the criteria for listings 12.04,  Affective Disorders; 12.06, Anxiety Related Disorders; and 12.09, Substance Addiction Disorders.  The ALJ analyzed the claimant's depressive, bipolar, and panic impairments under the "paragraph B" criteria first, and then "paragraph C" criteria found in 12.04 and 12.06 to determine whether the claimant's mental impairments met or equaled a listed impairment. (R. 15).

The ALJ noted that an impairment is equivalent to a listed impairment under "paragraph B" criteria if it meets at least two of the following criteria: marked restriction in the activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or recurrent episodes of decompensation, each of an extended duration. The ALJ defined "marked" as greater than moderate but less than extreme, and extended duration as three episodes within a year with each episode lasting at least two weeks.  (R. 15).

The ALJ remarked that an impairment is equivalent to a listed impairment under "paragraph C" criteria if it results in repeated episodes of decompensation, a propensity to decompensate, or an inability to live independently. (R. 15).

20

The ALJ found mild limitations in the claimant's activities of daily living, but moderate limitations in the claimant's social functioning and concentration, persistence, and pace. The ALJ noted no instances of repeated decompensation. (R. 15).

To support his findings of mild limitation on the claimant's activities of daily living, the ALJ stated that the claimant's family's transiency inhibits routine and makes the claimant's daily activities appear more restricted than they otherwise would be. The ALJ also cited the claimant's unconvincing statement of poor motivation; the claimant's lack of specific limitations in areas as wide ranging as completing chores, taking public transportation, managing money, shopping, or using a telephone; the claimant's clean and well-groomed appearance; and the claimant's general ability to independently perform the activities of daily living. (R. 15).

With respect to social functioning, the ALJ found numerous indications that the claimant was not subject to marked limitations. As evidence, the ALJ pointed to the claimant's living arrangements among a large extended family, previous marriage, visits with a neighbor, and ability to get along with authority figures. The ALJ found that the independent observations of treatment providers and agency field representatives as to the claimant's relaxed and cooperative demeanor bespoke a likely capacity to interact with anyone he might reasonably be expected to meet while employed. (R. 15).

Regarding the claimant's concentration, persistence, and pace, the ALJ paid particular attention to the results of clinical and standardized examinations. Thus, the ALJ attached significant weight to the examination Dr. Blotcky conducted where he found the claimant possessed accurate memory, structured thinking, adequate abstract reasoning, fair insight, and "grossly intact" judgment buttressing an ability and willingness to learn. The ALJ also cited

objective measurements of the claimant like the Wechsler Adult Intelligence Scale showing the claimant's low average intellectual functioning; high school diploma and average to above average grades; and ability to play the guitar. (R. 15-16).

As the claimant did not possess two or more marked limitations, the ALJ next addressed whether the claimant satisfied the criteria of "paragraph C." The ALJ established that the claimant had not satisfied the criteria of "paragraph C" because the claimant did not have repeated episodes of decompensation or an inability to live independently. (R. 16).

Because the claimant did not meet the criteria under "paragraph B" or "paragraph C," the ALJ found that he did not meet or equal a listed impairment based upon 12.04 and 12.06.  The ALJ next considered whether the claimant might meet or equal an impairment under 12.09. However, the ALJ ruled out that possibility after noting that the listing requires the claimant to meet one of nine other listings as a result of his substance abuse, none of which the claimant satisfied.  (R. 16).

The ALJ determined that the claimant possessed the residual functional capacity to complete medium work subject to several additional limitations. The ALJ stated that the work must be simple, repetitive, and non-detailed, not result in more than casual and infrequent co-worker and public contact, feature direct but non-confrontational supervision, and introduce change in only a gradual and infrequent manner.  (R. 16).

To reach this conclusion, the ALJ indicated that he considered all relevant medical and opinion evidence consistent with the regulatory guidelines. The ALJ applied the pain standard in evaluating the claimant's subjective symptoms. First, the ALJ established whether a physical or mental impairment  might reasonably be expected to produce the claimant's pain or other symptoms. Second, once the ALJ determined that such an impairment existed, he evaluated the

intensity, persistence, and the limiting effects of the symptoms to establish the degree to which they limited the claimant's functioning.  The ALJ noted that this burden may be satisfied through objective evidence, or, in its absence, a finding regarding the credibility of the statements in consideration of the entire case record.  (R. 16-17).

The ALJ found that the the mental health records did not support a finding of disability. In particular, he noted that the claimant disregarded medical advice in refusing to take a prescribed medication and quit mental health counseling after little effort.  The ALJ considered the claimant's GAF score of 70 as indicative of his level of functioning in the presence of occasional counseling and medication management. The ALJ noted that when the claimant scored a 30 on his GAF, he was without mental health care and was in a situationally stressful environment, but had frequent access to prescription pain medication.  (R. 18).

Nor did the ALJ find persuasive the claimant's argument that he could not afford therapy. The ALJ discounted this argument by making reference to the expenditures the claimant makes to support his daily tobacco and alcohol use in addition to his access to personal care products, water, electricity, food, television, clothing, transportation, and pain medication. (R. 18).

In short, the ALJ found that while the claimant's identifiable impairments could indeed cause the reported symptoms, the impairments were not severe enough to produce the alleged intensity, frequency, and limiting effects.  Further, the ALJ explained why, in reaching this conclusion, he gave little weight to the medical opinion of Dr. Blotcky, an examining psychologist. The ALJ considered it partially discrediting that the services of Dr. Blotcky were obtained through counsel for the claimant, but more significant to the ALJ was the sharp contrast between the benign results of Dr. Blotcky's mental status examination and the dire limitations set forth in his opinion.

The ALJ found that Dr. Blotcky's opinion was further deficient in that he provided no textual justification for his opinion. The ALJ further distinguished between the two by referencing the "independent mental health record" that substantiated the opinions held by Dr. Blotcky.  (R. 18-19).

The ALJ next determined that the claimant could not engage in past relevant work. Although the ALJ considered that the claimant's prior work as a lathe tender, exclusive of his other prior occupations, was consistent with the claimant's available RFC, he could not determine whether the claimant had ever performed the work in a manner rising to the level of substantial gainful activity. Thus, the ALJ found that the claimant could not complete any of his past relevant work.  (R. 19).

The ALJ considered the claimant's relevant characteristics and RFC, and found that jobs exist in the national economy that the claimant can perform. Based on the vocational expert's testimony, the ALJ found that with the claimant's RFC, the claimant could work as a material handler, hand packer, and packager and that each of these jobs exist in significant numbers in the national economy.  (R. 19-20).

The ALJ concluded that under the Social Security Act, the claimant has not been disabled since March 30, 2009 through the publishing of the ALJ's decision.  (R. 20).

## VI. DISCUSSION

*Failure to Develop the Record*

The claimant argues that the ALJ failed to develop the record by failing to re-contact Dr. Blotcky or to order an additional consultative examination from a qualified psychiatrist or psychologist after finding inconsistencies in Dr. Blotcky's medical opinion regarding the

claimant's limitations under the "paragraph B" criteria for mental impairments. This court agrees

with the claimant and finds that the ALJ's decision is due to be reversed and remanded.

Although the claimant has the burden to prove his disability, the ALJ must fully and fairly

develop the record. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). Where a colorable

claim for mental impairments exists, the ALJ should ensure that a psychiatrist or psychologist has

assessed the claimant's mental limitations. 20 C.F.R. § 416.903(3).

> (e) Initial determinations for mental impairments. An initial
> determination by a State agency or the Social Security
> Administration that you are not disabled (or a Social Security
> Administration review of a State agency's initial determination), in
> any case where there is evidence which indicates the existence of a
> mental impairment, will be made only after every reasonable effort
> has been made to ensure that a qualified psychiatrist or psychologist
> has completed the medical portion of the case review and any
> applicable residual functional capacity assessment. If the services of
> qualified psychiatrists or psychologists cannot be obtained because
> of impediments at the State level, the Commissioner may contract
> directly for the services.

*Id*.; *See McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988) (quoting 42 U.S.C.A. § 421(h)).

Because the ALJ found, at step two in the disability evaluation process, that the claimant

suffered from severe mental impairments, including bipolar disorder, anxiety disorder, and

depressive disorder, the ALJ had a duty to make every effort to obtain the opinion of a qualified

psychiatrist or psychologist before making his disability determination. In this case, the ALJ did

not obtain or order a psychiatric or psychological evaluation of the claimant. Instead, the

claimant's attorney referred the claimant to Dr. Alan Blotcky, a clinical psychologist, for a

psychological examination on October 28, 2010.

The court notes that the ALJ, in essence, somewhat frowned upon Dr. Blotcky's assessment

from the beginning because the claimant's attorney arranged for the assessment with Dr. Blotcky. However, had the claimant's attorney not done so, the ALJ would have no choice but to arrange such an assessment himself, given the fact that the record contains no other assessment from a psychiatrist or psychologist, during the relevant time frame, specifically assessing the claimant's mental limitations.  Given the claimant's serious mental impairments of bipolar disorder, anxiety disorder, and depressive disorder, having a qualified psychiatrist or psychologist assess the mental limitations caused by the claimant's diagnosed mental impairments is crucial to a correct evaluation of his abilities.

For the 12 months prior to the alleged onset date of March 30, 2009, the record contains no medical opinion from a psychiatrist or psychologist as to the limiting effects of his severe mental impairments.  Although the record contains medical evidence regarding the existence of his severe mental impairments from 2001 through 2008, none of those records contains a psychiatrist or psychologist's medical opinion regarding how his mental impairments limit his ability to work. The only medical opinion assessing the claimant's mental limitations in the context of "paragraph B" is Dr. Blotcky's opinion of October 28, 2010.

Of specific concern to the court is the ALJ's favorable reliance on one part of Dr. Blotcky's opinion, but complete rejection of his ultimate findings.  The ALJ favorably discussed and relied on the mental assessment portion of Dr. Blotcky's opinion when the ALJ discussed the four criteria in "paragraph B" regarding the limitations imposed by the claimant's mental impairments.  Yet, the ALJ found Dr. Blotcky's mental RFC assessment totally inconsistent with his own medical assessment findings and disregarded his ultimate medical conclusions regarding the claimant's mental limitations. Seemingly, the ALJ picked the portions of Dr. Blotcky's assessment that

supported his decision and relied on them, but chose to discredit the parts of his opinion that contradicted the ALJ's findings.  In doing so, the ALJ abused his discretion by "substitut[ing] his own uninformed medical evaluations for those of . . ." a licensed psychologist. *See Marybury*, 957 F.2d at 840.

The court acknowledges that the ALJ can discredit the findings of a consultative examiner. However, this court finds that at the point that the ALJ chose to follow part of Dr. Blotcky's assessment regarding his impressions of the claimant but, at the same time, completely rejecting Dr. Blotcky's ultimate assessment of the claimant's mental limitations, a serious problem arose. At that point, the record contained no other medical evidence *from a psychiatrist or psychologist* specifically regarding how the claimant's severe mental impairments limit his ability to work.  The court acknowledges that the ALJ did incorporate the psychiatric review technique in evaluating the claimant's mental limitations. However, the court finds that when the ALJ totally ignored Dr. Blotcky's medical determinations, the ALJ had no substantial evidence from a psychiatrist or psychologist to support his ultimate determination regarding the claimant's mental limitations.

In disregarding Dr. Blotcky's ultimate findings that the claimant had marked mental limitations under "paragraph B," the ALJ relied on the results of a mental examination from 2002, while the claimant was in prison, showing a GAF score of 70 to support his finding of mild mental limitations in activities of daily living.  The ALJ relied on this high GAF score in assessing only mild limitations in the claimant's mental functioning when he takes medication and receives counseling.  (R. 18)  However, the ALJ failed to assign weight to GAF scores completed in 2002, 2006, 2009, and 2010 all showing a GAF score between 30-55: March 5, 2002 showing a GAF score of 50; May 11, 2006 showing a GAF score of 55; June 16, 2009 showing a GAF score of 30;

and March 7, 2010 showing a GAF score of 40.

GAF scores between 30-50 can indicate serious mental impairments in functioning. *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418 (11th Cir. 2006) (citation omitted). For any GAF score in the medical record revealing possible serious mental impairments, the ALJ should determine what weight, if any, to give that particular score. *Id.* However, the Commissioner has noted that the GAF scale "'does not have a direct correlation to the severity requirements in [the] mental disorders listings.'" *Nye v. Commissioner of Social Sec.*, No. 12-16091, 2013 WL 3869964, at *4 (11th Cir. July 26, 2013). Therefore, the ALJ is not bound by a GAF score in making his ultimate disability determination. *Luterman v.Commissioner*, 518 Fed. Appx. 683, 690 (11th Cir. 2013).

The ALJ referenced and relied on the claimaint's GAF score of 70 in 2002 to support his finding that the claimant had no marked limitations in his mental functioning. Although the ALJ was not bound to accept or equate a GAF finding to the level of severity in the disability listings, he could not pick and choose to rely on only the highest and oldest GAF score to the exclusion of all others. The ALJ should have explained the weight given to each GAF score in the record that indicated the possibility of serious mental impairments. Other than the score of 70, the ALJ only mentioned the lowest GAF score of 30 assessed on June 16, 2009. The ALJ noted that the GAF score of 30 "coincided with a period marked by situational stressors; fluid access to prescription pain medication, and the absence of any mental health care." (R. 18). However, the ALJ failed to address the other low GAF scores given at times when the claimant had some mental health care treatment, including medications, while in prison. As such, the ALJ's explanation that the claimant's lowest GAF score of 30 occurred during a time of high stress and little structure is not

28

sufficient.  Also, the ALJ should have more thoroughly assessed the claimant's inability to function outside of highly structured environments and the effects of that inability on his mental limitations.

Moreover, in 2010, Dr. Aeschlimann assessed the claimant's GAF as 40, despite her finding that the claimant's suicidal ideation was a ruse to obtain more pain medication.  A GAF score this low from a doctor who did not find the claimant credible is telling.  Yet, the ALJ ignored this GAF score and failed to assess its weight.

The court also has concerns regarding other evidence the ALJ relied on in assessing the claimant's mental limitations under "paragraph B."  Also, in assessing the claimant's mild limitations on activities of daily living, the ALJ noted that the claimant "failed to report any particular limitations" with the use of public transportation or "going to a post office," among other things.  (R. 15).  However, the claimant *did* testify to particular limitations regarding transportation stating that, even if he found transportation, he did not want to leave his residence on most days because of his fear of having a panic attack.  (R. 46). The claimant's fear of leaving his house is supported by his long history of and diagnosis of panic disorder with agoraphobia and could inhibit him from using public transportation or leaving his home to go to the post office.  The ALJ failed to include in his analysis regarding activities of daily living the claimant's specific limitations resulting from a long history and diagnosis of panic disorder with agoraphobia.

Moreover, the ALJ states that "treatment notes document [the claimant's] independent ability to perform a full range of daily activities."  (R. 15).  However, the treatment notes addressing the claimant's activities of daily living all come from medical personnel assessing the claimant's physical complaints, not from mental health specialists.  Likewise, each treatment note making this assertion gives no indication regarding what particular activities the claimant can

perform or whether the doctor or nurse making the determination fully assessed the claimant's *mental* limitations in making such a broad statement. (R. 404-05, 409, 428, 443, 446).

The court understands the province of the ALJ in making credibility assessments. However, the court cannot ignore the ALJ's decision to make his ultimate finding without reconciling the perceived inconsistencies in Dr. Blotcky's mental assessment of the claimant. To fully develop the record, the ALJ should re-contact a doctor if he is a treating source; if the treating source's opinion is unclear on an issue reserved for the commissioner; and if the ALJ is unable to ascertain the basis for the opinion from the record. SSR 96-5p.

In this case, Dr. Blotcky was a treating source. The ALJ found that Dr. Blotcky's opinion was unclear in that his medical assessment observations conflicted with his ultimate findings on the issue of the claimant's mental limitations; and the ALJ indicated that Dr. Blotcky gave no "narrative rationalization for the apparent discrepancies between his selection and his examination results." (R. 18-19).  At the very least, this court finds that the ALJ should have re-contacted Dr. Blotcky to deal with such blatant inconsistencies before the ALJ chose to significantly rely on a portion of Dr. Blotcky's mental assessment and disregard his ultimate medical finding.

Further, this court finds that, after finding major inconsistencies in Dr. Blotcky's assessment of the claimant's mental limitations and completely rejecting his ultimate findings, the ALJ had a duty to develop the record further and order his own mental assessment of the claimant because no substantial evidence from a psychiatrist or psychologist, other than Dr. Blotcky, existed in the record to support the ALJ's ultimate determination that the claimant did not meet a mental impairment listing. Where an inconsistency exists in the record or the medical record as a whole does not support a determination on the disability claim, the ALJ should order a consultative

examination. 20 C.F.R. §§ 416.903(a), 416.919, 416.919a(b). Had he done so, the ALJ may have had an actual medical assessment from a psychiatrist or psychologist contradicting Dr. Blotcky's assessment. At that point, the ALJ could have articulated the weight he gave each contradicting assessment and his reasons for his findings.

As it stands, the court finds that substantial evidence does not support the ALJ's finding regarding the claimant's mental limitations, and that the ALJ failed to properly develop the record.

This court finds that reversal and remand is warranted for the ALJ to further develop the record, including contacting Dr. Blotcky and/or ordering an additional mental assessment from a qualified psychiatrist or psychologist specifically addressing the psychiatric review technique.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is not supported by substantial evidence and is due to be REVERSED and REMANDED. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 30th day of September, 2013.

*Karon O. Bowdre*

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE